UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LYNN K. STARR,

        Plaintiff,                    Case No. 08-cv-12434

vs.                                            DISTRICT JUDGE JOHN CORBETT O'MEARA
                                           MAGISTRATE JUDGE STEVEN D. PEPE

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.
=========================/

## REPORT AND RECOMMENDATION

**I.**     **BACKGROUND**

Lynn K. Starr brought this action under 42 U.S.C. § 405(g) and §1383(c)(3) for judicial review of the Commissioner's final decision that Plaintiff was not entitled to Disability Insurance Benefits ("DIB") under Title II of the Social Security Act or Supplemental Social Security Income ("SSI") under Title XVI of the Social Security Act. Both parties have filed motions for summary Judgment, which have been referred pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the following reasons, it is **RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and Defendant's Motion for Summary Judgment be **GRANTED**.

    **A.**     **Procedural History**

Plaintiff filed an application for DIB and SSI in August 2005, alleging that he became disabled December 5, 2002, as a result of injuries caused by falling off a scaffold at work (R. 73-75, 78-79, 355-258). After Plaintiff's application was denied upon initial review (R. 50-53, 359-

1

362),[1] an administrative hearing was held on March 22, 2007, at which Plaintiff was represented by Terrence Bloomquist (R. 363). Vocational Expert ("VE") Paul Delmar, Ph.D., also testified (R. 388).

In an August 29, 2007, decision, Administrative Law Judge ("ALJ") William E. Decker found that Plaintiff was not under a disability, as defined by the Act, because he remained capable of performing a significant number of jobs in the national economy (R. 14-21). On April 9, 2008, the Appeals Council denied review of the ALJ's decision (R. 4-6), at which time the August 29, 2007, decision became the final decision of the Commissioner. *See* 20 C.F.R. § 404.981.

### B.   Background Fact

Plaintiff was 54 years old on the date of the ALJ's decision (R. 20). He completed the eleventh grade (R. 84), and had prior work experience as a janitor and laborer (R. 79).

#### 1.   *Plaintiff's Testimony and Statements*

Plaintiff testified that he has constant and continuous neck pain since his injury; that he has never been without pain since then (R. 372). The pain worsens if he turns his head to the left (R. 373). The pain radiates up the left side of his head to his left ear and straight across his forehead. Plaintiff was using no prescription medications at the time of the hearing. His low back pain has been intermittent since his injury and is worsened by the weather, but does not radiate into his legs (R. 374). Plaintiff receives no treatment for his lower back pain at this time, and seeks relief by reclining in a chair. His back pain is worsened by prolonged standing.

---

[1] Pursuant to procedures being tested as part of a disability redesign prototype, Plaintiff's claim was not subject to the reconsideration step of the administrative review process. *See* 20 C.F.R. §§ 404.900, 404.906(b)(4).

Plaintiff can walk less than one block, can stand for 15 to 20 minutes, and can be on his feet no more than two hours per day (R. 375). He can sit for one to two hours. Plaintiff has difficulty turning his head to the left, and occasionally has difficulty bending at the waist, usually being able to go part way. He can occasionally lift 20 to 25 pounds from table height, and no more than five pounds frequently (R. 376).

Plaintiff testified that he mostly watches television and plays cards all day (R. 378). He is able to take care of his own personal needs, prepares his own meals, and does no yard work or maintenance. Plaintiff said he would not be able to work any job for an eight hour day, as he needs to lie down for 60 to 90 minutes in the morning and in the afternoon due to headaches, although he takes no medications for his headaches (R. 380). He said he has headaches every day, all day, with "level 10" pain for three to three and one-half hours at a time (R. 381-382).

   **2.** *Medical Evidence*

On December 5, 2002, Plaintiff was admitted to Munson Medical Center in Traverse City, Michigan, due to a fall from a scaffold which caused him to strike his neck on a dumpster — a fellow worker also had slipped from the same height and then had fallen on top of him (R. 144). He experienced neck pain thereafter. The doctors concluded that Plaintiff had a neurologically intact Type II odontoid fracture, and he then was fitted with a halo brace (R. 155). X-rays of the thoracic spine revealed there might be a slight superior end plate compression of T-12 with a questionable buckle of the anterior superior of the vertebral body; there was a more convincing mild superior end plate compression of L1 (R. 148). Cervical spine x-rays had shown a possible odontoid fracture, a mild T-9 anterior vertebral body compression fracture and T12 and L1 anterior vertebral body compression fractures (R. 152).

3

During and after Plaintiff's admission to Munson Hospital, he was treated by neurosurgeon Paul F. Davis, M.D. On January 6, 2003, the doctor described Plaintiff as having suffered a C2 onontoid fracture as well as minor thoracolumbar compression fractures which had been maintained in a halo fixation since the second week of December (R. 180). At that time, x-rays showed reasonable alignment of the onontoid process with a C2 body that had not significantly changed since approximately one month earlier. As of February 13, Plaintiff was doing well from a neurological standpoint and demonstrated good healing (R. 178). On March 3, Dr. Davis thought Plaintiff was showing good healing across the fractured site, and thus his halo vest was removed and a Philadelphia collar was positioned (R. 175). The doctor continued to restrict Plaintiff from strenuous physical activity. On March 17, Plaintiff showed no evidence of instability at the C2 level, and the doctor thus referred him for physical therapy. By April 24, Plaintiff reported no neck pain following four weeks of physical therapy, and he denied any radiation of pain into his arms (R. 168). Dr. Davis thus cleared Plaintiff to return to light duty work with a lifting restriction of 20 pounds.

On October 27, 2003, Plaintiff underwent a medial branch nerve block to the left cervical facets of C3, C4 and C5 which was administered by A. Michael Derosayro, M.D., an anesthesiologist specializing in pain management (R. 165). He then returned to see Dr. Davis on February 2, 2004, due to a referral from the pain clinic because of his ongoing complaints of neck pain which occurred in the lateral aspect of his neck and radiated into the occipital region (R. 164). The pain seemed to persist regardless of Plaintiff's activities. He also noted decreased rotation of his neck toward the left side when compared to the right. During the examination, Plaintiff expressed some discomfort to palpation of the muscles of the lateral neck,

4

specifically in the erector spinae on the left hand side and some components of the trapezius. His extension and flexion were mildly reduced. An MRI showed severe degenerative changes throughout his spine with foraminal narrowing at multiple levels including C3-4, C4-5, C5-6 and C6-7, although there did appear to be good healing across the area of his fracture. Dr. Davis did not think there was any issue that would benefits from surgery; he prescribed conservative management with range of motion activity as tolerated, although he also did think that Plaintiff should stop smoking.

Plaintiff also treated at the Munson Medical Center in Traverse City. On December 8, 2003, his doctor apparently diagnosed multi-level degenerative disc disease in his cervical spine and thought he should be restricted from lifting more than 11 to 25 pounds or from standing for more than one to three hours (R. 191). As of November of 2004, Plaintiff was restricted from lifting more than 25 pounds and from any twisting, pushing or pulling (R. 183). Plaintiff began treating with Michael Burkley, D.O., a family practitioner, on May 13, 2003 (R. 255). Later, he reported to the emergency room at Munson Hospital on June 12 with a headache which was worsening, and he was discharged in stable condition after having been given some pain medicine (R. 253-254).

On June 24, Plaintiff saw Dr. Burkley due to his complaints of severe headaches which had been ongoing for two months with almost constant symptoms and which were frontal in location with radiation to the ears and jaw (R. 252). The headaches were associated with the continuing left-sided neck pain which did not radiate into his left shoulder or arm. He had limited range of motion with left rotation. The exam revealed muscle spasms of the left-sided paraspinal musculature which apparently caused the very limited range of motion during left

5

rotation. Dr. Burkley diagnosed tension headaches related to myofascial neck pain and muscle spasms.

Plaintiff returned to the Munson Medical Center Pain Clinic on September 4, 2003. The exam showed that he had almost full rotation of the left, although it was limited by at least 50 percent and by pain, and lateral bending to the left also was painful as was extension with lateral bending (R. 248). Dr. Derosayro diagnosed persistent left-sided neck pain which since the C2 fracture with intermittent headaches that were not improving, and the doctor thought Plaintiff's pain might be secondary to cervical facet joint dysfunction (R. 249). The doctor thought that nerve blocks might improve his condition. On September 26, Plaintiff told Dr. Burkley that the treatment prescribed by the Pain Clinic seemed to have markedly improved his chronic headaches. Yet, he continued to have limited range of motion since his cervical fracture. The doctor noted a flattened affect and limited range of motion of the cervical spine, especially during left rotation, which was limited to only about 20 degrees. There was also some restriction during extension of the cervical spine. Dr. Burkley diagnosed chronic headaches, residual neck pain and decreased range of motion, and he thought Plaintiff should be limited in terms of exposure to machinery, driving and heights because his prescription for Topamax was causing some symptoms of drowsiness. The doctor thought Plaintiff should be limited in working above his head and shoulders and from work that require repetitive turning of the head and neck.

Plaintiff returned to Dr. Derosayro on October 27, 2003, for another medial branch nerve blocks which he tolerated well (R. 241-242). At his next appointment at the pain clinic on November 24, he was examined by Vincent Cornellier, Ph.D., a psychologist, at the referral of Dr. Derosayro. During the interview, he complained bitterly of episodic headache

6

pain and felt as though the top of his head was going to explode (R. 237). When asked about how many brothers and sisters he had, he lost count, could not name all of them, became agitated and said he was simply the oldest. Plaintiff had a history of several convictions for drunk driving, and while he had quit drinking alcohol, he did smoke two packs of cigarettes per day (R. 238). The doctor thought that non-compliance could be an issue for Plaintiff because of the risk of abusing medicines and that there was some depression present (R. 239).

Plaintiff returned to Dr. Burkley on December 2 with his main complaint being of continued neck pain and headaches (R. 236). When examined, he continued to demonstrate limited range of motion of the cervical spine, and there was hypertonus of the suboccipital musculature. The doctor diagnosed chronic headaches, neck pain and decreased cervical spine motion, and he thought that Plaintiff should continue with his current work restrictions. An MRI taken on December 8 showed multi-level degenerative disc space disease which was most pronounced at C3-C4 and C4-C5 levels where there also was moderately severe bilateral neuroforaminal encroachment (R. 233-234).

Later, Plaintiff underwent a left greater occipital nerve block on December 22 with Richard Burke, M.D. (R. 227-228). As of January 2, 2004, Dr. Burkley thought Plaintiff could only occasionally stand, bend, twist, crouch, push/pull, walk or climb (R. 226). He could only occasionally lift from 11 to 25 pounds. Plaintiff observed that his two visits to the Pain Clinic had caused very little improvement (R. 225). One month later, Plaintiff's complaints continued, and he observed that his headaches seemed to be aggravated by certain changes in position of his head and neck (R. 222). As a result, the doctor limited Plaintiff further by saying he was currently incapable of twisting his neck and that he should do only occasional lifting of less than ten pounds (R. 223).

7

Plaintiff saw Dr. Derosayro a week later on February 11, and he was adamant that the Topamax did not help his pain and that his headaches continued to be very troublesome (R. 220). The doctor thus changed his prescription to Neurontin. On February 27, Dr. Corey Rodnick performed a paraspinal surface EMG study which revealed moderate elevations of muscle tension at C5, T2 and T4 with reading of severe muscle tension elevation at C1 (R. 217). There were also a number of areas of significant asymmetry. A thermal narrative also showed severe asymmetry at C1 (R. 218). By March 5, Plaintiff told Dr. Burkley that Neurontin had not caused much improvement in his pain, which continued to be localized in the left side of the neck (R. 216). The doctor did not change his diagnoses or his work restrictions at that time.

By August 3, however, the doctor found Plaintiff was incapable of twisting or pushing or pulling, and he only could very rarely perform climbing (R. 215). He thought Plaintiff could rarely lift more than ten pounds. As of December 8, Plaintiff's symptoms had been worsening, and he noted difficulty and limitation with simple daily living activities (R. 213). The exam showed severely reduced leftward rotation, moderately reduced rightward motion and tenderness in a number of areas (R. 213-214). The doctor did not make any changes in restrictions or in treatment (R. 214). On January 13, 2005, the doctor noted earlier complaints of back pain, and at that appointment, the severity was seven on a scale of one to ten, with episodes lasting five to ten minutes (R. 211). By February 24, Plaintiff was showing decreased grip strength and finger-thumb approximation in his left arm (R. 209). As of May 26, the doctor limited Plaintiff to only occasional standing, bending, crouching, walking, climbing and lifting up to 25 pounds (R. 206). Plaintiff continued to see Dr. Burkley on a regular basis through August 1, 2005, without any significant changes in his condition (R. 196-203).

8

On September 27, a nonexamining psychologist concluded that Plaintiff did not have a significant mental disorder (R. 263- 276). A Physical Residual Functional Capacity Assessment ("RFC") concluded that Plaintiff could perform light work with some additional restrictions as of December 17, 2005 (R. 278-285).

On September 1, 2005, Plaintiff returned to Dr. Burkley, and his back pain continued to be at a level of seven on a scale of one to ten, with episodes of exacerbation that occurred several times per week (R. 323). The doctor observed tenderness in the sternocleidomastoid with severely reduced leftward rotation and moderately reduced rightward rotation (R. 323-324). There also was increased tone in the right sternocleidomastoid as well with increased tone in the right trapezius (R. 324). The back examination revealed mild lordosis with moderately reduced extension and paraspinal muscle tenderness on the right. 28 days later, Plaintiff had problems with his shoulder with symptoms localized to the neck and lateral aspect of the shoulder. He complained of pain with range of motion and activities, of stiffness and of numbness and tingling (R. 321). By that time, the leftward rotation in his head and neck was severely reduced on the left and moderately reduced on the right. Also, he had a decrease of grip strength in his left arm (R. 322).

On November 16, Plaintiff continued to have similar findings, and the extension in his head and neck was now severely reduced (R. 319). By December 6, Plaintiff's back pain had improved somewhat, but his restrictions continued (R. 317). On March 13, the doctor had decided to refer his client to a pain clinic for additional treatment due to his ongoing symptoms (R. 311-313). By December 5, Plaintiff's grip strength had decreased again (R. 345). On January 16, 2007, Plaintiff had additional complaints of ringing in his left ear and of a pins and

9

needle sensation in the area of his left shoulder and neck which traveled into his mid-back (R. 352).

### 3. *Vocational Evidence*

Vocational expert Paul Delmar, Ph.D., described Plaintiff's past work as being a laborer, a general laborer and various jobs ranging from light to heavy in exertional level (R. 371-372).

The ALJ then questioned the vocational expert and asked him to assume given the limitations to which Plaintiff had testified; the VE noted that because of the time Plaintiff would miss from work due to headaches, that he could not perform any jobs (R. 388). When VE Delmar was asked to consider a Residual Functional Capacity Evaluation ("RFC") from December of 2003, he thought Plaintiff could perform some of his former work under those restrictions (R. 388-389). Under Dr. Davis' lifting restriction of 20 pounds, Plaintiff could have still performed his light job as a general laborer (R. 389). Under the restrictions from Dr. Burkley dated September of 2003, the expert concluded Plaintiff could not have performed his past relevant work, but there were still a number of other jobs that could be performed under that scenario (R. 389-390). When Dr. Burkley's restrictions from December of 2004 were considered, approximately 12,000 light unskilled jobs would have been available for Plaintiff (R. 390-391).

During questioning by Plaintiff's attorney, VE Delmar acknowledged that some of the information indicated Plaintiff had not had any jobs at the medium level, but that he had performed two past jobs that were at the light level (R. 392-395). When asked if Plaintiff's difficulty in turning his neck with other maneuvers precluded him from light work, VE Delmar stated that the jobs that he had enumerated at the light level would have been performed at table or bench height, and he said that those jobs would have required frequent or continuous forward

flexion of his neck (R. 396-398). VE Delmar indicated that if Plaintiff had pain with forward flexion, that that factor would preclude him from performing such work because forward flexion would be required on a frequent or a continuous basis on those jobs (R. 398). After additional questions from the ALJ, Delmar did say that his job numbers would reduce to 9,000 if there was no limitation of forward flexion but limited rotation to the left (R. 399-400).

When the ALJ pointed that there had been no mention of limitations of forward flexion in the Record, Plaintiff's attorney argued that the consistent physical findings in the case clearly would have encompassed such movements (R. 401-402).

### *4.* *ALJ Decker's August 29, 2007, Decision*

In an Opinion dated August 29, 2007, ALJ Decker denied Plaintiff's claim for benefits (R. 11-21). The ALJ found that Plaintiff's headaches were related to his neck impairment, and he also concluded Plaintiff did not have a severe mental impairment (R. 16-17). The ALJ concluded Plaintiff's complaints of symptoms were not entirely credible because "[i]maging has revealed no more than mild signs" (R. 19). He further concluded that Plaintiff's doctors had not supported Plaintiff's own complaints of limitations, and the ALJ noted that Plaintiff had not quit smoking despite requests that he do so . He noted that Dr. Burkley had released Plaintiff to work within his restrictions and that there were no suggestions of any limitation of forward flexion in the Record (R. 19-20). While he concluded Plaintiff could not perform his past relevant work, he found that Plaintiff had an ability to perform approximately 12,000 light jobs in the state of Michigan and thus found him to be not disabled (R. 20-21).

11

**II.     ANALYSIS**

    **A.     <u>Standards of Review</u>**

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence.  *See* 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.  *Mullen v. Brown*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than her past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.  A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.  *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray Plaintiff's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the Plaintiff's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must

state with precision the physical and mental impairments of the Plaintiff."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

### B. Factual Analysis

Plaintiff contends that remand is necessary in this case because the ALJ improperly rejected the opinion of treating physician Dr. Burkley; improperly assessed his credibility on the basis of his smoking habit without considering his work history; and failed to rely upon the correct hypothetical and resulting VE testimony.

#### 1. Plaintiff's Treating Physician

Plaintiff claims that the ALJ improperly rejected the opinion of treating source Dr. Burkley. Yet, he does not cite what exactly about Dr. Burkley's opinion the ALJ should have credited, stating only that the doctor "significantly restricted virtually all physical activities for Plaintiff, and he never lifted those restrictions (R. 294)." (Dkt. #11, p. 11). Plaintiff cites *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 546 (6th Cir. 2004), ostensibly to claim that the ALJ did not provide good reasons for rejecting Dr. Burkley's opinion, which apparently restricted Plaintiff from all physical activity. Neither does Plaintiff cite any actual evidence from the record, instead claiming the medical evidence "appears to be largely uncontroverted" and that the ALJ's finding that he could work full-time is unsupported by substantial evidence, for "who could really argue that . . . he still could perform work that required forward flexion of his neck?" (Dkt. #11, p. 12).

It is well established that the findings and opinions of treating physicians are entitled to substantial weight. The case law in this circuit has stated that if adequately supported by objective findings, and if uncontradicted by other substantial medical evidence of record, a

13

treating physician's opinion of disability is binding on the Social Security Administration as a matter of law. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference"); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) (same); *Lashley v. Secretary of HHS*, 708 F.2d 1048, 1054 (6th Cir. 1983) (same); *Bowie v. Harris*, 679 F.2d 654, 656 (6th Cir. 1982); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980). The administrative decision could reject a properly supported treating physician's opinion of disability if the record contains "substantial evidence to the contrary." *Hardaway v. Sec'y of HHS*, 823 F.2d 922, 927 (6th Cir. 1987).

Under the Social Security Administration regulations, the Commissioner will generally give more weight to the opinions of treating sources, but it sets preconditions for doing so. 20 C.F.R. §404.1527. The Commissioner will only be bound by a treating source opinion when it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in your case record." 20 C.F.R. § 404.1527(d); *See also*, S.S.R. 96-2p.

Yet, the conclusion of whether a Plaintiff is "disabled" is a decision reserved to the Commissioner to decide (R. 19). 20 C.F.R. §§ 404.1527(e)(1), (2), 416.927(e)(1), (2). And, "[w]e will not give any special significance to the source of an opinion on an issue reserved to the Commissioner." *Id*. at §§ 404.1527(e)(3), 416.927(e)(3). The regulations and case law recognize that the opinion of a physician, including a treating physician, is entitled to great weight only if it is supported by adequate medical data, including medical signs and laboratory findings, and does not conflict with other evidence. 20 C.F.R. § 404.1527(d)(2)(3)(4); *Walters*, 127 F.3d at 530.

The reason Plaintiff cannot cite any part of Dr. Burkley's opinion rejected by the ALJ is because the ALJ did not in fact reject it. He largely accepted Dr. Bukley's restrictions, adopting his specific findings over those of the agency's reviewing physicians. Here, Dr. Burkley provided numerous checked-box multiple-choice forms,"Work Restriction Evaluation", most recently in March 2006, and provided Plaintiff would be able to stand, bend, crouch, walk, or climb for a maximum of 1-3 hours, and could lift up to 25 pounds, but could not twist or push/pull (R. 294).[2] In these many Work Restriction Evaluations Dr. Burkley repeatedly notes that Plaintiff would be able to return to work with these restrictions, but was unlikely to ever return to his past normal capabilities (*id.*).

The ALJ's RFC assessment tracks Dr. Burkley's opinion in Work Restriction Evaluations which he used in questioning the Vocational Expert . He found that Plaintiff could not return to his past work. The ALJ also found that Plaintiff could lift up to 25 pounds and stand, walk, bend, crouch, and climb for no more than 3 hours at a time, with no twisting or pushing/pulling (R. 17). He interprets the "maximum number of hours" noted in the Work Restriction Evaluations as meaning up to 1-3 hours at a time, and not as a maximum total for the day. The fact that the ALJ accepted and incorporated Dr. Burkley's opinions concerning Plaintiff's functional limitations constitutes substantial evidence. *Davis v. Sec'y of Health & Human Servs.*, 915 F.2d 186, 189 (6th Cir. 1990) ("The [Commissioner] asserts that substantial evidence to support this conclusion lies in the hypothetical question in which the ALJ asked the vocational expert to consider Davis'

---

[2] Dr. Burkley apparently generated these checked-box forms as a matter of course, as there are many found within the record. Aside from one from September 2003 form that allows for lifting up to 75 pounds (R. 245), they are generally consistent. Some only preclude climbing (R. 215), while some preclude only twisting of the neck (R. 223), but the ALJ took all the restrictions provided by Dr. Burkley throughout his treatment history, and preserved them in his RFC assessment (R. 199, 202, 206, 215, 223, 226, 245, 295-305, 307-10).

residual functional capacity under [treating source] Dr. VanHoose's limitations. We agree, as this question accurately portrayed Davis' limitations as reported by his treating physician.").

Additionally, all other medical source opinion evidence from the record accords with the ALJ's findings. Dr. Davis, Plaintiff's neurosurgeon, released Plaintiff to light duty work with no climbing or axial loading (force applied to the top of the head when the neck is flexed) (R. 168). Similarly, state agency reviewing physician Dr. Nelson opined that Plaintiff could perform light work (R. 279). Under these circumstances, this Court should reject Plaintiff's argument and affirm the Commissioner's final decision.

### 2. Plaintiff's Credibility

Plaintiff further contends that the ALJ's credibility assessment is not supported by substantial evidence. He appears to believe the ALJ gave undue weight to his 1½ to 2 packs per day smoking habit in finding him less than credible, stating that legally, ". . .a person cannot be denied benefits for a failure to quit smoking. . . . " (Dkt. #11, p. 13).

Subjective evidence is only considered to "the extent . . . [it] can reasonably be accepted as consistent with the objective medical evidence and other evidence" (20 C.F.R. 404.1529(a)). The ALJ is not required to accept a claimant's own testimony regarding allegations of disabling pain when such testimony is not supported by the record. *See Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987). The issue of a claimant's credibility regarding subjective complaints is within the scope of the ALJ's fact finding discretion. *Kirk v. Secretary of health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981); *Jones v. Commissioner of Social Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).

In order for an ALJ to properly discredit a claimant's subjective testimony, the credibility determination must be accompanied by a detailed statement explaining the ALJ's reasons.

16

S.S.R. 96-7p directs that findings on credibility cannot be general and conclusory findings, but rather they must be specific. The ALJ must say more than the testimony is not credible. *Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994), made it clear that the ALJ cannot merely recount the medical evidence and claimant's daily activities and then, without analysis, summarily conclude that the overall evidence does not contain the requisite clinical, diagnostic or laboratory findings to substantiate the claimant's testimony regarding pain. *Id*. at 1039.

Here, Plaintiff claimed that he could not walk even one block, could stand for only 15 to 20 minutes, sit for only 1 to 2 hours, and could not be on his feet for more than 2 hours per day (R. 18). The ALJ reasonably concluded these extreme claims of limitation were unsupported by objective and other evidence. Plaintiff's own treating physician consistently noted normal strength and tone in his muscles, with normal rotation and stability in his spine (R. 197, 201, 205, 208, 209, 211, 214). Dr. Burkley's many Work Restriction Evaluations consistently showed a greater capacity than Plaintiff claims. Cervical X-rays from September 2003 were "unremarkable" (R. 251), while a December 2003 cervical MRI showed only degenerative disc changes (R. 234). Dr. Davis, Plaintiff's neurosurgeon noted that February 2004 MRI imaging showed good healing at the site of Plaintiff's cervical fracture, and no herniation, protrusion, stenosis, or compression (R. 164). Dr. Davis also observed in March 2003 that Plaintiff had no numbness, tingling, or weakness, and demonstrated "good power" and was well-balanced (R. 173). *Crouch v. Sec'y of Health & Human Servs*., 909 F.2d 852, 856–57 (6th Cir. 1990) (providing that minimal clinical findings and absence of significant neurological deficits support rejection of allegation of disabling pain).

As outlined above, the ALJ also fully considered and accepted all available medical

17

source opinion evidence as well. And, other evidence fails to corroborate the degree of Plaintiff's claimed limitation. For example, the ALJ observed that Plaintiff regularly declined Dr. Burkley's offers of prescriptions for pain medication (R. 19, 306, 332, 334). In contrast, Plaintiff claimed extreme levels of pain at the hearing.

In this context, the ALJ also questioned Plaintiff's motivation to heal and work - while Plaintiff believes the ALJ should not have considered his smoking, where his physicians repeatedly urged him to stop smoking in order to improve his recovery (R. 145, 159, 238, 315), in fact it is legitimate to do so, particularly where smoking reduces the effectiveness of treatment.[3] *Sias v. Sec'y of Health & Human Servs.*, 861 F.2d 475, 480 (6th Cir. 1988) ("The Social Security Act did not repeal the principle of individual responsibility. . . . If the claimant in this case chooses to drive himself to an early grave, that is his privilege - but if he is not truly disabled, he has no right to require those who pay social security taxes to help underwrite the cost of his ride.").

Thus, the ALJ reasonably concluded that Plaintiff's claims of disabling fatigue and fainting were not consistent with the record. Because the ALJ's credibility assessment is consistent with the medical evidence of record, including medical source opinions, and credits Plaintiff's allegations of limitation to a reasonable degree, and because credibility determinations are afforded great deference, this Court should affirm the ALJ's decision.

### 3. The Hypothetical Question

---

[3] It is well-established in the medical community that smoking increases the time required to heal bony fractures, as demonstrated in a clinical study by Northwestern University Medical School, which found that only 68% of smokers healed completely from a fracture, compared to 95% of non-smokers, and that smokers who did heal took over 2 months longer to do so compared to their non-smoking counterparts. *See* Reuters, Smoking Slows Bone Healing, available at http://www.personalmd.com/news/a1998040313.shtml. Thus, Plaintiff's smoking habit, which was characterized as an "above average" habit (R. 238), is relevant where his primary injury is cervical fracture, as confirmed by his neurosurgeon (R. 159).

Plaintiff also claims that the ALJ should have relied upon a hypothetical to the VE that resulted in the elimination of all jobs (Dkt. #11, p. 13). In this case, the ALJ provided several hypothetical questions to the VE (R. 388-401). The first assumed all Plaintiff's alleged limitations were credible, to which the VE responded that no jobs were available (R. 388). As outlined above, however, the ALJ properly declined to find Plaintiff fully credible, and instead relied upon restrictions provided consistently by Dr. Burkley, his treating physician. When this hypothetical was provided with limitations on twisting, pushing and pulling, the VE testified as to 12,000 light manufacturing positions (R. 390- 91). When asked to clarify the effect of Plaintiff's difficulty rotating his head left or right, the VE reduced that number to 9,000 (R. 400).

It is possible Plaintiff refers to a restriction on forward flexion with his neck, which his attorney posited during cross-examination; the VE stated that he did not know how such a restriction would affect the jobs (R. 400). Yet, the record shows no evidence of such a restriction - Dr. Burkley never recorded such a restriction, and an examination in September 2003 revealed full flexion with almost full extension (R. 248). Thus, there is no evidence to support such a restriction, and the ALJ reasonably declined to do so. The ALJ's RFC assessment is consistent with the evidence of record, and the subsequent hypothetical to the VE yielded 9,000 light jobs Plaintiff could perform. Plaintiff has not established any reason the ALJ should have fully credited his extreme claims. Because it is supported by substantial evidence, the Commissioner's final decision should be affirmed.

### III.     RECOMMENDATION

For the reasons stated above, it is **RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and Defendant's Motion for Summary Judgment be **GRANTED**. The parties to this action may object to and seek review of this Report and Recommendation, but are

19

required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local, 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: July 17, 2009                    s/ Steven D. Pepe
Ann Arbor, MI                           United States Magistrate Judge

**CERTIFICATE OF SERVICE**

The undersigned certifies that a copy of the foregoing *Report and Recommendation* was served on the attorneys and/or parties of record by electronic means or U.S. Mail on July 17, 2009.

                                        s/Deadrea Eldridge
                                        Generalist Deputy Clerk